# EXHIBIT 9



# For-Profit Pharmacy Participation in the 340B Program: 2024 Update

JANUARY 2025

**PREPARED BY:**

**Eleanor Blalock**
Director
Washington, DC
eblalock@thinkbrg.com
240.475.0697

INTELLIGENCE THAT WORKS





## Introduction and Executive Summary

In 1996, the Health Resources and Services Administration (HRSA) published guidance allowing certain covered entities without their own in-house pharmacies to contract with a single outside pharmacy to dispense 340B Drug Pricing Program drugs to eligible patients.[1] These outside pharmacies are known as "contract pharmacies." In 2010, new guidance permitted all covered entities to use an unlimited number of contract pharmacies.[2] Unlike the 1996 version, which addressed a threshold ability for certain covered entities to dispense 340B drugs, the 2010 update allowed covered entities already able to dispense such medicines to greatly expand their use of 340B and derive more profits from the program.

Covered entities have not been the only beneficiaries of this policy change; for-profit contract pharmacies share in the profits on 340B drugs they dispense on behalf of covered entities. The opportunity to benefit financially from 340B pricing has proven attractive to many for-profit pharmacies, including those owned by some of the largest corporations in the United States (Walmart, UnitedHealth Group, CVS Health, Cigna, etc.), as evidenced by their growing presence and investment in the program.

This BRG study provides an update to a 2020 BRG report[3] and focuses on historical trends in 340B contract pharmacy arrangements, increased involvement of for-profit corporations in the program, average profit margins on 340B-purchased medicines, and potential impact of growth in 340B contract pharmacy involvement. Key findings include:

- Following HRSA's expansion of its contract pharmacy guidance in March 2010, *contract pharmacy arrangements with covered entities grew* from fewer than 2,000 in 2010 to more than 200,000 in 2024.

- Today, more than 44 percent of contract pharmacy arrangements *involve a pharmacy owned by a large payer/pharmacy benefit manager* (PBM) (Express Scripts/Cigna, CVS/Aetna, and Optum/United).

- The *average 340B profit margin*—which is split between the contract pharmacy, covered entity, and any third-party vendors—across one hundred top brand drugs commonly dispensed by contract pharmacies is approximately 72 percent, compared to typical non-340B profit margins of 3 to 4 percent across all brand drugs.

- 340B covered entities and their contract pharmacies generated *over $64 billion in profits* from 340B purchased drugs in 2023, of which approximately 9 percent was retained by contract pharmacies.

---

1  Federal Register, "Notice Regarding Section 602 of the Veterans Health Act of 1992; Contract Pharmacy Services" (61 FR 43549, August 23, 1996). https://www.govinfo.gov/content/pkg/FR-1996-08-23/pdf/96-21485.pdf

2  Federal Register, "Notice Regarding 340B Drug Pricing Program—Contract Pharmacy Services" (75 FR 10272, March 5, 2010). https://www.govinfo.gov/content/pkg/FR-2010-03-05/pdf/2010-4755.pdf

3  Aaron Vandervelde, Kevin Erb, and Lauren Hurley, *For-Profit Pharmacy Participation in the 340B Program*, BRG (October 2020). https://media.thinkbrg.com/wp-content/uploads/2020/10/06150726/BRG-ForProfitPharmacyParticipation340B_2020.pdf

# Growth of Contract Pharmacies

In 2000, 97 percent of all contract pharmacy arrangements were between covered entities and independent pharmacies (i.e., not affiliated with a chain), and 81 percent were with pharmacies located within 10 miles of the 340B Drug Pricing Program entity.[4]

Between July 1, 2010, and July 1, 2024, the number of contract pharmacy arrangements increased 12,000 percent from 1,740 to 212,022 (see Figure 1). Data disclosed by the Congressional Budget Office in 2024 revealed that 340B drugs dispensed through contract pharmacies, as measured at the 340B price, grew from $0.3 billion (5 percent of the program) in 2010 to $7.6 billion (17 percent of the program) in 2021.[5]

**Figure 1.**

**Contract Pharmacy Arrangements**
July 1, 2010 - July 1, 2024



As of July 2024, almost 33,000 of the approximately 60,000 individual pharmacies in the United States were involved in the 340B program as contract pharmacies. These pharmacies include all major chains, including CVS, Walgreens, Walmart, and many more. Today, 340B covered entities contract with, on average, twenty distinct pharmacy locations that are, on average, 381 miles away from the covered entity. Some pharmacies are traditional retail pharmacies, and others are mail-order or specialty pharmacies. Traditional retail pharmacies are an average of 46 miles away from the 340B covered entity. Individual covered entities report having arrangements with as many as three hundred contract pharmacies, including pharmacies that are over a thousand miles away. Hospitals account for 35 percent of all contract pharmacy arrangements as of 2024, a notable increase from 9 percent in 2010 when contract pharmacies were permitted only for covered entities that lacked the ability to dispense 340B drugs.

---

4   Based on BRG analysis of the 340B covered entity and contract pharmacy data published by HRSA.
5   Rebecca Sachs and Joshua Varcie, "Spending in the 340B Drug Pricing Program, 2010 to 2021" Congressional Budget Office (June 17, 2024). https://www.cbo.gov/system/files/2024-06/60339-340B-Drug-Pricing-Program.pdf

## Fast Facts: Contract Pharmacy Growth

| General Statistics | Hospitals 2010 | Hospitals 2024 | Grantees 2010 | Grantees 2024 |
|---|---|---|---|---|
| Total contract pharmacy arrangements | 158 | 74,478 | 1,582 | 137,544 |
| % of total contract pharmacy arrangements | 9% | 35% | 91% | 65% |
| Average contract pharmacies per entity | 2 | 33 | 1 | 17 |
| Average distance b/w contract pharmacy and entity | 37 | 422 | 44 | 358 |
| Average distance b/w retail contract pharmacy and entity | 7 | 40 | 9 | 49 |
| **Penetration Rate** | | | | |
| Count of entities w/ contract pharmacies | 84 | 2,259 | 1,217 | 8,095 |
| % of entities with contract pharmacies | 11% | 82% | 13% | 35% |

**Figure 2.**

**Average Number of Contract Pharmacy Arrangements per 340B Hospital and Grantee**
2010 vs. 2024



## Involvement of For-Profit Corporations in 340B

The expansion of 340B contract pharmacy arrangements is driven primarily by the significant profit margins associated with dispensing 340B drugs. The average profit margin on 340B drugs dispensed through a contract pharmacy—the majority of which are brands—is 72 percent. Outside 340B, pharmacies earn a much lower margin, between 3 and 4 percent, on brand drugs.[6]

While the average discount is 72 percent for 340B drugs dispensed through contract pharmacies, some 340B drugs are priced as low as a penny. The covered entities or contract pharmacies that dispense these "penny priced" medications typically receive full reimbursement from private insurance, Medicare Part D plans, or other payers, which may exceed thousands of dollars for certain specialty medications.[7] The outsized profit margins associated with the 340B program have, unsurprisingly, attracted large for-profit corporations that have increasingly influenced the program's trajectory.

---

6   Neeraj Sood et al., *The Flow of Money Through the Pharmaceutical Distribution System*, USC Schaeffer Center white paper series (June 2017), p. 7. https://healthpolicy.usc.edu/wp-content/uploads/2017/06/The-Flow-of-Money-Through-the-Pharmaceutical-Distribution-System_Final_Spreadsheet.pdf

7   340B drugs paid under Medicaid fee-for-service are reimbursed based on actual acquisition cost. However, these requirements do not apply to Medicaid managed care organizations (MCOs). Federal Register, "Medicaid Program; Covered Outpatient Drugs" 81 FR 5170–5357, February 1, 2016); CMS, *Covered Outpatient Drug Final Rule with Comment (CMS-2345-FC) Frequently Asked Questions* (July 2016). https://www.medicaid.gov/federal-policy-guidance/downloads/faq070616.pdf.

# The Role of Vertically Integrated Pharmacies and PBMs

Over the past two decades, vertically integrated pharmacies owned by pharmacy benefit managers (PBMs) have become involved in the 340B program in increasing numbers. PBMs manage the administration of the pharmacy benefit, including pharmacy network design and formulary management, on behalf of the insurer or other payer. The three largest PBMs in the US—Express Scripts, CVS, and Optum—account for 80 percent of the PBM market.[8] Each of these "big three" PBMs is part of a larger healthcare conglomerate that owns specialty and/or retail pharmacies, an insurer, and one or more provider groups in addition to the PBM.

Each of the big three PBMs is active in the 340B contract pharmacy space. In 2010, 340B covered entities only had fifty-five (3 percent) contract pharmacy arrangements with a pharmacy owned by one of the big three PBMs. By 2024, this number grew to 94,098 and accounted for 44 percent of total arrangements (see Figure 3). Between 2020 and 2024, contract pharmacy arrangements between 340B covered entities and PBM-affiliated pharmacies more than tripled.

**Figure 3.**

**Total Arrangements between 340B Covered Entities and PBM-Affiliated Contract Pharmacies**



**Ways Vertically Integrated Companies Maximize Profit from 340B**

- Create pharmacy networks to steer patients toward contract pharmacies
- Negotiate with covered entities for the share of 340B margin retained by affiliated contract pharmacies
- Require covered entities to use affiliated TPAs, creating additional opportunities to profit

Vertically integrated pharmacies are uniquely positioned to take advantage of the 340B program because the PBM controls the pharmacy network and sets patients' cost sharing at in- and out-of-network pharmacies. As a result, the PBM can influence its members' use of the PBM's pharmacies. This is particularly common for high-cost specialty drugs that offer the greatest 340B margin opportunity.

This degree of influence over the dispensing location can provide PBM-owned pharmacies with leverage over potential covered entity partners. For example, if the covered entity must send certain prescriptions for certain patients to a PBM-owned pharmacy due to payer requirements, the covered entity might decide to enter into a contract where it is only able to collect a small share of the 340B margin if the alternative is forgoing the 340B profit on the dispense entirely by not contracting with that pharmacy. This leverage has allowed PBM-owned pharmacies to retain a relatively large share of 340B profit per filled 340B prescription for themselves.

Recent reporting from industry analysts suggests that contract pharmacies can collect between 25 and 35 percent of the 340B margin associated with the prescriptions they dispense.[9] The five largest contract pharmacy parent companies earned an estimated $2.9 billion from 340B in 2023.[10] PBMs' exposure to 340B has become significant enough to merit mention in companies' disclosures to investors. In its earnings presentation from the first quarter of 2023, CVS partially attributed lower-than-expected earnings to "emerging 340B risk."[11]

---

8  Adam J. Fein, "The Top Pharmacy Benefit Managers of 2023: Market Share and Trends for the Biggest Companies – And What's Ahead," Drug Channels (April 9, 2024). https://www.drugchannels.net/2024/04/the-top-pharmacy-benefit-managers-of.html.

9  Adam J. Fein, "EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market," Drug Channels (September 24, 2023). https://www.drugchannels.net/2023/09/exclusive-340b-program-reached-54.html

10  Ibid.

11  CVS, *Earnings conference call* (May 3, 2023). https://s2.q4cdn.com/447711729/files/doc_financials/2023/q1/Q1-2023-Earnings-Presentation.pdf#page=14

# Evolving Contract Pharmacy Operations and Third-Party Administrators

As the contract pharmacy channel has expanded to include large corporations and greater prescription volume, operations have become more sophisticated as well. When contract pharmacy arrangements were still a nascent concept, pharmacies maintained a separate physical inventory of drugs purchased at the 340B price by the covered entity. When presented with a prescription for a covered entity patient, the pharmacist would dispense from that separate 340B inventory. All other prescriptions would be filled using the contract pharmacy's own non-340B inventory.

As contract pharmacy arrangements expanded in scope, this dual "physical inventory" model, which relies on manual review by pharmacists of each potentially eligible prescription, was replaced with a replenishment or virtual inventory model, under which contract pharmacies dispense from one commingled inventory. After prescriptions are dispensed, the pharmacies' data are then analyzed by a software provider known as a third-party administrator (TPA). The TPA identifies 340B-eligible claims based on a covered entity's interpretation of a "patient" under the program. Identification of a 340B-eligible claim triggers the order of new units at the 340B price, shipped to the contract pharmacy to replace or "replenish" the units already dispensed.

The leading TPAs are owned by vertically integrated healthcare corporations: Wellpartner (CVS Health), Verity Solutions (Cigna), 340B Complete (Walgreens), Macro Helix (McKesson), and Sentry Data Systems (Craneware)—offering another opportunity for these large corporations to retain 340B margin as profit. TPAs are generally compensated through a flat fee per prescription reviewed or identified as 340B, a percentage share of prescription reimbursement or margin, or a hybrid model.[12]

Another type of vendor—a "gateway"—has recently emerged, serving as an overlay to the traditional TPA process and operating on behalf of the contract pharmacy to coordinate with the pharmacy's broader inventory management processes. Employing a gateway can allow contract pharmacies greater control over the 340B replenishment process, including through the imposition of the contract pharmacy's own formulary. Like TPAs, the largest gateways—VHUB (Cigna), 340B Complete (Walgreens), and Macro Helix (McKesson)—are owned by vertically integrated healthcare companies.

The significant financial opportunity available in 340B has attracted investment from corporations, private equity firms, and venture capitalists. According to publicly available information and data sets and company disclosures, at least thirteen corporate, venture capital, or private equity transactions have taken place in the 340B space in the last three years, with the two largest investments, both by vertically integrated corporations, totaling nearly $10 billion.[13]

| | Vertical Integration of National Pharmacies | | | |
|---|---|---|---|---|
| Health Plan | Aetna | Cigna Healthspring | | United Healthcare |
| PBM | CVS Caremark | Express Scripts | | OptumRX |
| Pharmacy (retail, mail order and/or specialty pharmacy) | CVS Caremark | Accredo | Walgreens | OptumSpecialty |
| Third Party 340B Services Firm | Wellpartner | Verity Solutions | 340B Complete / Shields Health Solutions | |

---

12 US Government Accountability Office, "Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement" (June 2018). https://www.gao.gov/assets/gao-18-480.pdf

13 CVS Health acquired Signify Health in 2023 for $8 billion: "CVS Health Completes Acquisition of Signify Health," PR Newswire (March 29, 2023). https://www.prnewswire.com/news-releases/cvs-health-completes-acquisition-of-signify-health-301784079.html; Walgreens acquired Shields Health in 2022 with a $1.4 billion investment: Walgreens Boots Alliance, "Walgreens Boots Alliance Accelerates Full Acquisition of High-Performing Shields Health Solutions" (September 20, 2022). https://www.walgreensbootsalliance.com/news-media/press-releases/2022/walgreens-boots-alliance-accelerates-full-acquisition-high.

## 340B Profit Margins for Medicines Dispensed through Contract Pharmacies

As discussed further in Appendix A, we developed a methodology to estimate the 340B price using publicly available data and applied this methodology to the top one hundred brand drugs based on 2022 Medicare Part D spending. Our methodology incorporates the statutory Medicaid rebate and the inflationary penalty. Based on comparisons of our estimated 340B prices and publicly disclosed 340B prices, as well as the structural design of our methodology, we believe that our 340B price estimates are conservative and, therefore, expect the actual 340B prices to be lower than our calculations.

When comparing our 340B price estimate to the wholesale acquisition cost (WAC) for the same drug, our analysis found the weighted average 340B price was 72 percent lower than WAC across the top one hundred brand retail drugs (according to 2022 Part D sales) in 2024.[14] For certain therapeutic classes with high competition or drugs that have been available in the market for many years, the average discounted 340B price exceeded 80 percent below WAC (see Figure 5). Fifteen of the top one hundred drugs had 340B pricing of 90 percent or more, and twelve had 340B pricing of 95 percent or more below WAC.

**Figure 4. Estimated Average 340B Discounts by Therapeutic Class 2024 Q3**

| Therapeutic Class | Est. Average Discount | # Medicines in Class | Medicines with a Discount of at Least: | | | |
|---|---|---|---|---|---|---|
| | | | 70% | 80% | 90% | 95% |
| Antidiabetic agent | 88% | 17 | 17 | 8 | 8 | 7 |
| Anti-infective agent | 52% | 8 | 2 | 1 | 0 | 0 |
| Antineoplastic agent | 60% | 19 | 2 | 1 | 1 | 1 |
| Blood modifier agent | 87% | 5 | 3 | 3 | 1 | 1 |
| Cardiovascular agent | 47% | 8 | 1 | 1 | 0 | 0 |
| Central nervous system agent | 60% | 11 | 3 | 2 | 0 | 0 |
| Endocrine metabolic agent | 92% | 3 | 3 | 3 | 2 | 1 |
| Gastrointestinal agent | 68% | 7 | 5 | 1 | 1 | 1 |
| Genitourinary agent | 73% | 2 | 1 | 0 | 0 | 0 |
| Immunological agent | 65% | 4 | 2 | 0 | 0 | 0 |
| Ophthalmologic agent | 98% | 2 | 2 | 2 | 2 | 1 |
| Respiratory agent | 55% | 14 | 3 | 1 | 0 | 0 |
| **Top 100 Products** | **72%** | **100** | **44** | **23** | **15** | **12** |

Because reimbursement by commercial and Medicare Part D insurance plans is approximately equal to WAC for brand drugs, 340B covered entities and their contract pharmacies realized an average of 72 percent profit margin on 340B purchased brand drugs. This margin is more than twenty times greater than the average margin on brand drugs realized by non-340B pharmacies (3.5 percent) and has contributed to the rapid growth of 340B contract pharmacy arrangements.[15]

We estimate that 340B covered entities, 340B contract pharmacies, and other for-profit companies involved in 340B generated over $64 billion in profits from 340B purchased retail and nonretail drugs in 2023, of which $5 to $6 billion (9 percent) went to contract pharmacies and for-profit companies.[16]

---

14  Each brand was weighted according to its Medicare Part D spending in 2022.
15  Sood et al. (2017), p. 7.
16  Eleanor Blalock, Mira Ferritto, and Jeannie Taylor, *The Pharmaceutical Supply Chain*, 2013–2023, BRG (January 2025). https://media.thinkbrg.com/wp-content/uploads/2025/01/06161850/PhRMA_Supply-Chain-2013-2023_White-Paper.pdf.

# Implications of For-Profit Pharmacy Participation in the 340B Program

Our analysis demonstrates that contract pharmacy involvement in 340B—including by pharmacies affiliated with some of the largest US healthcare corporations—continues to expand. The involvement of these and other for-profit corporations in the 340B program has two important implications.

First, these corporations are, by definition, focused on increasing their own profitability and creating value for their investors. The opportunity to generate profit on each 340B prescription creates incentives for pharmacies to classify as many prescriptions as possible as 340B. As these pharmacies' corporate affiliates take a more active role in 340B identification and replenishment through their roles as TPAs and gateways, this may lead to further expansion of the 340B program.

Second, the vertically integrated nature of the largest contract pharmacies means that they may attempt to "steer" patients away from covered entity-owned and independent pharmacies toward PBM-affiliated contract pharmacies to try to maximize profit. As a result, even while increasing the size of the 340B program, for-profit corporations may be siphoning more 340B profits from the intended beneficiaries of the 340B program: safety net providers and the patients they serve.



# APPENDIX

## *Estimating the 340B Price*

For brand drugs, pharmacy reimbursement from payers and patients is roughly equivalent to the list price or wholesale acquisition cost (WAC) of the drug. To determine the profit margin on a 340B purchased drug dispensed through a 340B contract pharmacy, we must estimate the 340B discounted price of the drug.

The 340B price is calculated using a statutory formula derived from two pricing metrics central to the Medicaid Drug Rebate Program (MDRP). These MDRP metrics for brand drugs are defined as follows:

1. **Basic Medicaid Rebate:** equal to the greater of i) 23.1 percent of average manufacturer price (AMP) or ii) the difference between AMP and "best price"[17]

2. **Consumer Price Index (CPI) Penalty**: a price inflation penalty that grows as price increases for a drug exceed the rate of inflation[18]

Using these two primary components, the 340B price is equal to AMP less the statutory Medicaid rebate, less the inflationary penalty (see Figure A1). Depending on the competitive dynamics that exist in any therapeutic category, the 340B price, when calculated as defined by statute, could fall below $0.00. In these instances, the price is reset to $0.01 as part of a concept known as "penny pricing."[19]

### Figure A1: 340B Price Calculation Examples

|     | Pricing Component | Formula | Diabetes Example | Oncology Example |
| --- | --- | --- | --- | --- |
| [A] | AMP |  | $500.00 | $1,000.00 |
| [B] | Medicaid rebate | Greater of [C] or [D] | 250.00 | 231.00 |
| [C] | Base rebate | [A] * 23.1% | 115.50 | 231.00 |
| [D] | Best price | Largest discount | 250.00 | 100.00 |
| [E] | CPI penalty | Price increase above CPI | 225.00 | 200.00 |
| [F] | 340B discounted price | [A] - [B] - [E] | $25.00 | $569.00 |

---

17. As discussed in this study, this is the greater of the base Medicaid rebate (23.1 percent of AMP) or the "best price" discount, which represents the discount from AMP of the lowest available commercial price offered by the pharmaceutical manufacturer. The lowest available commercial price is typically the difference between the WAC and the largest rebate offered to commercial health plans. As rebate data is proprietary, we relied on public disclosures of average rebates and the typical ratio between average rebate and best price to arrive at a proxy for the best price.

18. We relied on the Elsevier Gold Standard Drug Database to determine the WAC for each drug at launch and as of 2024. We assumed the AMP to be 91 percent of WAC both at launch and in 2024. Inflation data (without seasonal adjustments) was collected from the Bureau of Labor and Statistics and used to establish the allowable increase in AMP for each product. The CPI penalty was calculated as the difference between the allowable AMP in 2024 versus the estimated 2024 AMP derived from the Gold Standard pricing data. Congressional Budget Office, "A Comparison of rand-Name Prices Among Selected Federal Programs" (February 2021). https://www.cbo.gov/publication/57007.

19. Federal Register, "340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation," final rule (82 FR 1210, January 5, 2017). https://www.hrsa.gov/sites/default/files/hrsa/opa/federal-register-1-5-2017.pdf

Figures related to 340B discounts and contract pharmacy profit margins are estimates. Exact calculations would require data proprietary to the parties involved, such as detailed gross sales figures and rebate data. Therefore, these estimates rely primarily on publicly available data or data that can be purchased through third-party vendors. In some instances, certain figures in the analysis have been estimated, conservatively, based on the authors' direct and extensive industry experience. These instances are noted below.

To understand the growing prevalence of contract pharmacies in the 340B program as well as overall program growth, we rely on information obtained directly from Health Resources and Services Administration (HRSA) reports. Current and historical registrations for both covered entities and contract pharmacies can be obtained directly from HRSA's Office of Pharmacy Affairs (340B OPAIS) website. After acquiring data from HRSA, additional analysis and research were required for identification of:

- pharmacy chains/ownership (parent corporate entities)
- exact geographical location (latitude and longitude) of covered entities and contract pharmacies

To estimate the average 340B discount for contract pharmacy dispensed drugs, we first identified the top one hundred brand drugs by Medicare Part D spending in 2022, the most recent year for which data are available. Although generic drugs are included in the 340B program, their low price and the structure of the 340B price calculation mean that margins associated with these drugs are often too small to support the fees associated with contract pharmacy utilization. Generics were therefore excluded in our analysis. Physician-administered drugs are rarely dispensed through contract pharmacies or through Medicare Part D and were also excluded from this analysis.

Though our methodology does not include the full universe of 340B eligible products, our market is highly representative of the products that drive 340B contract pharmacy margins. After identifying our market of one hundred brand drugs, we estimated the two components of the 340B price for each drug as outlined above: the CPI Penalty and the Basic Medicaid Rebate. In estimating the Basic Medicaid Rebate, we incorporated an estimate for each drug's best price based on average payer rebates disclosed by the US Government Accountability Office for Medicare Part D and the typical ratio between average rebate and best price as disclosed by the Congressional Budget Office.[20] From there, we calculated the 340B discount by comparing the estimated 340B price with the WAC for each drug. Our final estimated 340B discount of 72 reflects the average of these discounts weighted by each drug's 2022 total Medicare Part D spending.

---

20  US Government Accountability Office, *Medicare Part D: CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending* (September 2023). GAO-23-105270, MEDICARE PART D: CMS Should Monitor Effects of Rebates on Plan Formularies and Beneficiary Spending; Congressional Budget Office, "A Comparison of Brand-Name Prices Among Selected Federal Programs" (February 2021). https://www.cbo.gov/publication/57007





## About BRG

BRG is a global consulting firm that helps leading organizations advance in three key areas: economics, disputes, and investigations; corporate finance; and performance improvement. Headquartered in California with offices around the world, we are an integrated group of experts, industry leaders, academics, data scientists, and professionals working across borders and disciplines. We harness our collective expertise to deliver the inspired insights and practical strategies our clients need to stay ahead of what's next.

**THINKBRG.COM**

Copyright ©2025 by Berkeley Research Group, LLC. Except as may be expressly provided elsewhere in this publication, permission is hereby granted to produce and distribute copies of individual works from this publication for nonprofit educational purposes, provided that the author, source, and copyright notice are included on each copy. This permission is in addition to rights of reproduction granted under Sections 107, 108, and other provisions of the US Copyright Act and its amendments.

Disclaimer: The opinions expressed in this publication are those of the individual authors and do not represent the opinions of BRG or its other employees and affiliates. The brief was funded by the Pharmaceutical Research and Manufacturers of America. The information provided in the publication is not intended to and does not render legal, accounting, tax, or other professional advice or services, and no client relationship is established with BRG by making any information available in this publication, or from you transmitting an email or other message to us. None of the information contained herein should be used as a substitute for consultation with competent advisors.