# EXHIBIT A

J. Ryan Mitchell (9362)
Christopher A. Langston (18218)
Colby Tinney (19713)
MITCHELL BARLOW & MANSFIELD, P.C.
Nine Exchange Place, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 998-8888
Facsimile: (801) 998-8077
Email: rmitchell@mbmlawyers.com
         clangston@mbmlawyers.com
         ctinney@mbmlawyers.com

*Local Counsel for Amicus Curiae Association for Utah Community Health*

Stephen M. Kuperberg (admitted *pro hac vice*)
Madelaine M. Cleghorn (admitted *pro hac vice*)
FELDESMAN LEIFER LLP
1129 20th Street, NW, Suite 400,
Washington, D.C. 20036
Telephone: (202) 466-8960
Facsimile: (202) 293-8103
Email: skuperberg@feldesman.com
         mcleghorn@feldesman.com

*Counsel for Amicus Curiae Association for Utah Community Health*

---

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| ABBVIE INC., et al., <br><br>     Plaintiff, <br><br> v. <br><br> DEREK BROWN, et al., <br><br>     Defendant. | **BRIEF OF *AMICUS CURIAE* ASSOCIATION FOR UTAH COMMUNITY HEALTH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Case No. 2:25-cv-271-RJS-DAO <br><br> Judge Robert J. Shelby <br> Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

-ii-

**STATEMENT OF INTEREST**...........................................................................................1

**BACKGROUND** ...........................................................................................................4

I.     Congress Created the 340B Statute in Response to Manufacturer Price Increases to Safety Net Providers Including FQHCs.........................................................4

II.    Since 1996, HRSA and Courts Have Acknowledged the Gap in the 340B Statute Regarding Delivery and Have Deferred to State Law for the Delivery and Dispensing of 340B Drugs...............................................................................................8

    A.    HRSA's 1996 & 2010 Contract Pharmacy Guidance Acknowledged the Vital Role of State Law Contract Pharmacy Relationships to Effectuate the 340B Statute's Purposes ...............................................................................8

    B.    Contract Pharmacy Arrangements Enable Utah's FQHCs to Deliver Healthcare Services to Vulnerable Utahns.................................................................13

III.   Congress Established 340B Administrative Dispute Resolution as the Process to Address the Concerns Manufacturers Raise in This Litigation ............................................14

IV.   Utah SB 69 Originates from Manufacturers Choosing to Disregard the Statutory 340B ADR Remedy and Instead Resort to Harmful Self-Help, Unilateral Restrictions on State Law-Governed Contract Pharmacy Relationships...............................................................17

**ARGUMENT**...............................................................................................................19

    A.    Plaintiffs necessitated Utah SB 69 by disregarding the 340B ADR process Congress specified to address their purported concerns regarding duplicate discounts and diversion ...............................................................................19

    B.    Unlike the explicit 340B ADR remedy Congress specified, Congress purposefully left delivery and dispensing of prescription drugs unaltered in the 340B statute........21

    C.    Utah SB 69 is an appropriate and necessary response to Plaintiffs' and other manufacturers' unilateral resort to self-help and the imposition of restrictions on the rights of Utah's safety providers, including AUCH's member FQHCs, to contract with pharmacy agents for the delivery and dispensing of prescription drugs to Utah's most vulnerable patient populations ...........................................................22

**CONCLUSION** ...........................................................................................................23

## TABLE OF AUTHORITIES

**CASES**

*AbbVie Inc. v. Fitch*,
No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024) .......................19

*United States ex rel. Adventist Health Sys. /W. v. AbbVie, Inc.*,
723 F. Supp. 3d 882 (C.D. Cal. 2024) ................................................................................17

*Astra USA, Inc. v. Santa Clara Cty.*,
563 U.S. 110 (2011)...........................................................................................6, 16, 20

*AstraZeneca v. Fitch*,
No. 1:24CV196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024)...........................19

*Novartis Pharms. Corp. v. Johnson*,
102 F.4th 452 (D.C. Cir. 2024)........................................................................ *passim*

*Novartis Pharms. v. Bailey*,
No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025) ...............................19

*Novartis Pharms. v. Fitch*,
738 F. Supp. 3d 737 (S.D. Miss. 2024) ...............................................................................19

*PhRMA v. Fitch*,
No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024) ........................19

*PhRMA v. McClain*,
95 F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768 (2024)............................................ *passim*

*PhRMA v. Morrisey*,
760 F. Supp. 3d 439 (S.D.W. Va. 2024)...............................................................................19

*PhRMA v. Murrill*,
No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024) .....................................19

*Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*,
58 F.4th 696 (3d Cir. 2023) ........................................................................... *passim*

**STATUTES**

42 U.S.C. § 254b........................................................................................................2, 13

42 U.S.C. § 256b............................................................................................................6

42 U.S.C. § 256b(a)(4)(A) ...............................................................................................2

42 U.S.C. § 256b(a)(5)(A)(i) ...........................................................................................7

42 U.S.C. § 256b(a)(5)(B) ...........................................................................................................7

42 U.S.C. § 256b(d)(3) ...........................................................................................................7, 20

42 U.S.C. § 1396d(l)(2)(B) .........................................................................................................2

42 U.S.C. § 1396r-8 ...................................................................................................................4

Health Care and Education Reconciliation Act section 2302 (Pub. L. 111–152)........................15

PPA .............................................................................................................................................7

Patient Protection and Affordable Care Act Section 7102 (Pub. L. 111– 148) ...........................15

PHS Act section 340B(a)(5)(C) .............................................................................................15, 20

Public Health Service Act of 1992 Section 340B ..................................................................2, 6, 9

Public Health Service Act Section 330 ........................................................................................2

Public Health Service Act Sections 330 and 340B ....................................................................22

Utah Code Ann. 31A-46-311 ......................................................................................................1

## OTHER AUTHORITIES

42 C.F.R. § 10.20 ......................................................................................................................20

61 Fed. Reg. 43,549 (Aug. 23, 1996).........................................................................................8

61 Fed. Reg. at 43,549 ...............................................................................................................9

61 Fed. Reg. at 43,550 ............................................................................................................8, 9

61 Fed. Reg. 65,406 (Dec. 12, 1996) ........................................................................................11

75 Fed. Reg. 10,272 (Mar. 5, 2010)...........................................................................................12

89 Fed. Reg. 28,643 at 28,643 (Apr. 19, 2024) .........................................................................15

89 Fed. Reg. 28,643 at 28,644 (Apr. 19, 2024) .........................................................................11

89 Fed. Reg. at 28,644 ..........................................................................................................15, 16

H.R. Rep. 102-384 pt. 1, (1991) ......................................................................................... passim

H.R. Rep. No. 102-384, pt. 2 (1992)................................................................................... passim

Restatement of Agency 2d § 17 (1995) .....................................................................................10

Section IV., "Dispute Resolution," ...........................................................................................7

Utah Senate Bill 69 (2025) ........................................................................................................1

**STATEMENT OF INTEREST**

For over forty years, amicus Association for Utah Community Health (AUCH) has championed Utah's non-profit safety net community health centers and the vulnerable patients they serve. AUCH is a non-profit 501(c)(3) membership organization whose fourteen non-profit Federally Qualified Health Center (FQHCs) members provide comprehensive, high-quality primary and preventive health care services to over 173,000 Utahn patients, with or without insurance and regardless of ability to pay, at nearly 500,000 healthcare visits annually from seventy-three clinic sites in rural, frontier, and underserved urban communities across Utah. *See generally* Ex. 4, Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, ECF Docket No. 29-4 (Pruhs Decl.); *see also* "Patient Resources," Association for Utah Community Health, https://auch.org/patient-resources (last visited May 27, 2025).

AUCH has a compelling interest in this litigation because the subject law, Utah Code Ann. 31A-46-311, Utah Senate Bill 69 (2025) ("SB 69"),[1] affects AUCH's member FQHCs uniquely and profoundly. While roughly eight percent of Utahns lack health insurance,[2] nearly half of patients that AUCH's members serve—45%—are uninsured, 20% have Medicaid coverage, 8% have Medicare coverage, and just 27% have private insurance. Pruhs Decl. ¶ 6. Among AUCH's members' patients, nearly 9 out of 10 report income below twice the federal poverty limit, and over half report income at or below the federal poverty limit. *Id.*

---

[1] Available at Medication Amendments, S.B. 69, 2025 Gen. Sess. (Utah 2025), https://le.utah.gov/~2025/bills/static/SB0069.html (last visited May 27, 2025).

[2] Roughly 270,000 Utahns had no health insurance in 2022. With a relatively high uninsurance rate, Utah ranks near the top of states for this metric. "Health Insurance Coverage," Utah Department of Workforce Services, available at https://jobs.utah.gov/wi/data/library/other/healthinsurance.html.

FQHCs like AUCH's members serve an important role in the American healthcare safety net. FQHCs receive federal grants under Section 330 of the Public Health Service Act to provide medical care to uninsured patients regardless of the patient's ability to pay for those services.[3] However, federal grants do not fully cover the expenses AUCH's members incur in providing such services. For every dollar in federal Health Center Program funding that Utah's FQHCs received in 2023 to provide sliding-fee scale services to low-income patients, they needed to offset just over three dollars of non-funded expenses through other means. *Id.* at ¶ 7.

The voluntary condition Congress created for manufacturers who wish to participate in the Medicaid drug benefit, enacted as Section 340B of the Public Health Service Act of 1992, constitutes one such vital means. As FQHCs under Section 330 of the Public Health Service Act, AUCH's members qualify as covered entities under the companion statute, Section 340B. 42 U.S.C. § 256b(a)(4)(A); *see also* Pruhs Decl. ¶ 8. Because Utah's FQHCs specifically serve some of the most vulnerable communities and operate on thin financial margins, the savings AUCH's member FQHCs realize through 340B are imperative for maintaining operations. Pruhs Decl. ¶ 12. Section 340B discounts allow AUCH's member FQHCs to offset non-funded expenses from providing comprehensive care to vulnerable uninsured and underinsured patient populations; or, in the words of the legislative history of the 340B statute, to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12 (1992).

In four numbered paragraphs, Utah SB 69 clarifies that Utah state law does not permit manufacturers to interfere with the right of 340B covered entities like AUCH's member FQHCs

---

[3] 42 U.S.C. § 254b. Uniquely among Section 340B covered entities, Section 340B's covered entity designation for FQHCs cites to a definition that specifically authorizes FQHCs to provide services directly or by contract. *See* 42 U.S.C. § 1396d(l)(2)(B).

to contract with pharmacies to accept delivery of and dispense prescription drugs to the covered entity's patients on the covered entity's behalf. In fact, Utah SB 69 addresses the delivery mechanism that Plaintiffs in these related cases eagerly persuaded two Circuit Courts of Appeal to hold that the 340B statute did not address. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023); *see also PhRMA v. McClain*, 95 F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768, 220 (2024).

Without the protection Utah SB 69 affords, drug manufacturers have demonstrated that they will unilaterally restrict delivery of drugs that AUCH's member FQHCs purchase to dispense to their patients. As described more fully below, those unilateral manufacturer restrictions dramatically and negatively affected AUCH's members' ability to provide services under their federal mandate. Ironically, the unilateral restrictions manufacturers imposed on the delivery of 340B drugs to the contracted pharmacy agents of covered entities not only necessitated Utah SB 69—they were imposed in disregard to the remedy Congress included in the 340B statute and that the Supreme Court has indicated constitutes the exclusive remedy to address the manufacturers' purported concerns.

AUCH submits this brief to inform the Court of the real-world effects of Utah SB 69 on AUCH's member FQHCs and the vulnerable patients they serve, and to underscore that the Plaintiff manufacturers and trade association in these related cases not only fail to state claims for which relief can be granted—they are the jailors of their own invention, having ignored the exclusive federal remedy under the 340B statute for the concerns they purport to harbor.

## BACKGROUND

### I.    Congress Created the 340B Statute in Response to Manufacturer Price Increases to Safety Net Providers Including FQHCs

Congress enacted the 340B statute in 1992 in direct response to dramatic price increases drug manufacturers imposed on safety net providers, including FQHCs, following the implementation of the Medicaid Drug Rebate Program (MDRP). Congress created the MDRP in 1991 as a mechanism to provide a discounted net price to states and the federal government for prescription drugs purchased through the new Medicaid prescription drug benefit. The MDRP calculates the rebate amount based in part upon the manufacturer's "Best Price," that is, its lowest price offered to any purchaser. 42 U.S.C. § 1396r-8.

As Congressional hearings and testimony leading to the 340B statute revealed, manufacturers responded to the MDRP's rebate formula with swift and brutal price increases to safety net providers. "[T]he effect of this law [MDRP] has been harsh. In the absence of a mechanism to guard against unreasonable increases in 'best prices,' manufacturers moved quickly to increase their prices." H.R. Rep. No. 102-384, pt. 1, at 4 (1991). Manufacturer price increases to the safety net led to average drug prices rising overall more than 20% in just one year. H.R. Rep. No. 102-384, pt. 1, at 14 (1991). Manufacturer price increases particularly and acutely affected the ability of FQHCs to provide services to vulnerable patients:

> Federally-funded clinics and public hospitals serving large numbers of low-income patients also testified to the loss of 'best prices.' The Director of [the Texas primary care association] testified that … drug prices to the centers … have risen 'dramatically.' He gave the example of glyburide…. The centers have been informed by the manufacturer that next year, the price … will increase nearly 89 percent … *which translates into nearly 2,800 clinic visits.*

H.R. Rep. No. 102-384, pt. 2, at 10 (1992) (emphasis added).

4

Echoing Plaintiffs' claims in these cases, manufacturer representatives in those Congressional hearings claimed a need to raise prices for their own protection; however, objective analysis refuted the manufacturers' claims:

> Pharmaceutical manufacturers have asserted … that [MDRP] dictated a need on the part of manufacturers to protect themselves. It appears, however, that at least some of the industry's pricing practices reflect 'gaming' strategies, not self-defense....
>     [P]harmaceutical manufacturers have powerful incentives to raise their best prices so that the spread between best price and average manufacturer price is as small as possible. This pricing strategy not only would yield a smaller rebate paid by manufacturers to state Medicaid programs, it also would *shift some of the costs of Medicaid rebates to customers who previously purchased their prescription drugs at or near the manufacturer's best price*.

H.R. Rep. No. 102-384, pt. 1, at 8 (1991) (quoting Michael R. Pollard and John M. Coster, "Update," *Health Affairs*, Summer 1991, at 198–99) (internal quotation marks omitted) (emphasis added).

Over 30 years ago, as now, PhRMA (referred to in the Congressional reports as PMA) claimed that 340B would have devastating effects on the pharmaceutical industry:

> The Pharmaceutical Manufacturers Association strongly objected to [340B]. The Committee was warned that this bill 'would cause an unwarranted and unprecedented disruption of the U.S. free-market system–at a time when free-market principles are sweeping the world–through the imposition of government price controls on one of our country's most innovative and beneficial industries.'
>     PMA asserted that [340B] 'would constitute a far more radical and intrusive disruption of the free-market system' than [MDRP]…. The Association warns that enactment of this bill would lead to … less money generated for research and development, and ultimately a slowing of pharmaceutical innovation.[4]

H.R. Rep. No. 102-384, pt. 1, at 12 (1991). Congress, however, was unmoved that an effort to unwind the sudden and dramatic manufacturer price increases to FQHCs and other safety net

---

[4] The subsequent decades have not been kind to PhRMA's dire predictions of negative effects from the 340B statute on industry profits. *See, e.g.*, U.S. Government Accountability Office, *Drug Industry: Profits, Research and Development Spending, and Merger and Acquisition Deals,* GAO-18-40 (Nov. 17, 2017), https://www.gao.gov/assets/gao-18-40.pdf (last visited May 27, 2025).

providers—effectively, a price increase to the federal government whose grants support those entities and their patients—was the "radical and intrusive disruption of the free-market system" against which PhRMA importuned:

> Upon scrutiny, PMA's assertions and warnings evaporate…. Manufacturers enjoy the protection of a government monopoly in the form of a patent for any new product [and other statutory benefits] ….
>
> This Committee has taken no position on the merits of maintaining the structure of Governmental benefits, subsidies, and protections, which the pharmaceutical industry has clearly enjoyed [but] the industry's plea to leave undisturbed the free market within which it operates is a hollow one…. *what the industry seeks to maintain is not a free market, but the freedom to use Government-provided supports to raise prices and boost profits, even at the expense of the Government.*

H.R. Rep. No. 102-384, pt. 1, at 12–13 (1991) (emphasis added).

Accordingly, Congress created a condition on manufacturer participation in the Medicaid prescription drug benefit: *if* a manufacturer wishes to make a prescription drug eligible for purchase under Medicaid, then the manufacturer must agree to offer to sell that drug to specified safety net covered entities at no more than a ceiling price incorporating a discount using essentially the same statutory formula as the MDRP. 42 U.S.C. § 256b. Not all manufacturers agree to make their drugs eligible for purchase under Medicaid, or choose that eligibility for all their drugs; the decision is a voluntary one by the individual manufacturer on a drug-by-drug basis. Manufacturers enter Pharmaceutical Pricing Agreements (PPAs) with HHS to reflect this voluntary choice.[5]

---

[5] Although the Supreme Court has indicated that "PPAs are not transactional, bargained-for contracts," they "recite the responsibilities § 340B imposes … on drug manufacturers" and the "[m]anufacturers' eligibility to participate in State Medicaid programs is conditioned on their entry into PPAs for covered drugs purchased by 340B entities." *Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 113 (2011).

As to safety net covered entities, the 340B statute imposes two significant requirements: first, they may not contribute to causing a manufacturer to be subjected to both a 340B discounted ceiling price and the payment of a Medicaid rebate to a State for the same purchase—the so-called duplicate discount prohibition, 42 U.S.C. § 256b(a)(5)(A)(i); and they may not resell or otherwise transfer a 340B drug to a person who is not a patient of the entity—the so-called diversion prohibition, 42 U.S.C. § 256b(a)(5)(B). As described more fully below, the statute also specifies a binding administrative dispute resolution process by which manufacturers may seek relief for claims of covered entity violations of these subsections. 42 U.S.C. § 256b(d)(3).

HRSA has posted on its website an example PPA. *See* U.S. Department of Health & Human Services, Health Resources & Services Administration, *Pharmaceutical Pricing Agreement Example*, https://www.hrsa.gov/sites/default/files/hrsa/opa/pharmaceutical-pricing-agreement-example.pdf (last visited May 26, 2025). Among its requirements, the PPA specifies in Section IV., "Dispute Resolution," that:

> If the Manufacturer believes that a covered entity has violated the prohibition against resale or transfer of covered outpatient drugs, section 340B(a)(5)(B), or the prohibition against duplicate discounts or rebates, section 340B(a)(5)(A), the Manufacturer can access the elective dispute resolution process.

*Id.* at 6. As described more fully below, in the three decades prior to 2024, manufacturers almost never availed themselves of the 340B ADR process; nor, prior to 2024, is there a record of manufacturers seeking but failing to obtain agency consent to conduct the manufacturer audit of a covered entity that the statute makes a prerequisite to a manufacturer initiating administrative dispute resolution proceedings against a covered entity. Rather—as the following sections describe—manufacturers chose instead to resort to self-help by imposing unilateral restrictions

7

on the delivery of 340B drugs claiming that those unilateral restrictions were necessary to address manufacturer concerns regarding duplicate discounts and diversion—a self-help remedy not consistent with either the language of 340B statute or the manufacturers' voluntary PPAs.

## II. Since 1996, HRSA and Courts Have Acknowledged the Gap in the 340B Statute Regarding Delivery and Have Deferred to State Law for the Delivery and Dispensing of 340B Drugs

As the following sections describe, both the federal government, and later courts, have consistently acknowledged not only that the 340B statute does not address the delivery and dispensing of drugs subject to its provisions; they also have acknowledged that it would frustrate Congress's purpose in enacting the statute to fail to continue to provide access to contract pharmacy services under applicable state law. Those contractual relationships governed by Utah state law are vital to AUCH's member FQHCs delivering essential, federally-mandated services to vulnerable Utahns.

### A. HRSA's 1996 & 2010 Contract Pharmacy Guidance Acknowledged the Vital Role of State Law Contract Pharmacy Relationships to Effectuate the 340B Statute's Purposes

Following implementation of the 340B statute, HRSA quickly acknowledged that Congress premised the 340B statute upon a covered entity's ability to contract with outside pharmacies to receive delivery of and dispense 340B drugs to the covered entity's patients. 61 Fed. Reg. 43,549 (Aug. 23, 1996) (final notice). In fact, "only a very small number"—just four percent—of covered entities operated entity-owned pharmacies at the time. 61 Fed. Reg. at 43,550. For entities like AUCH's member FQHCs, who

> provide medical care for many individuals and families with incomes well below 200% of the Federal poverty level and subsidize prescription drugs for many of their patients, [contract pharmacy] *was essential* for them to access 340B pricing. Covered entities could then use savings realized from participation in the program to help subsidize prescriptions for their lower income patients, increase the number of patients whom they can subsidize and expand services and formularies.

*Id.* (emphasis added). HRSA elaborated that federal grantees, including FQHCs, Ryan White clinics, and others,

> depend upon outside pharmacy services. Yet, because the delivery of pharmacy services is central to the mission of (and a legal mandate in some instances for) these providers, they rely on outside pharmacies to fill the need. *It would defeat the purpose of the 340B program if these covered entities could not use their affiliated pharmacies in order to participate in the 340B program.* Otherwise, they would be faced with the untenable dilemma of having either to expend precious resources to develop their own in-house pharmacies (which for many would be impossible) or forego participation in the program altogether. Neither option is within the interest of the covered entities, the patients they serve, or is consistent with the intent of the law.

*Id.* (emphasis added).

In its 1996 final notice—consistent with HRSA's position in and the holdings of the Third and D.C. Circuit Courts of Appeal in cases nearly three decades later[6]—HRSA noted the gap in the 340B statute that is the central premise of this litigation:

> *The [340B] statute is silent as to permissible drug distribution systems*. There is no requirement for a covered entity to purchase drugs directly from the manufacturer or to dispense drugs itself. It is clear that Congress envisioned that various types of drug delivery systems would be used to meet the needs of the very diversified group of 340B covered entities.

61 Fed. Reg. at 43,549 (emphasis added). That statutory silence, HRSA observed, cut both ways:

> It has been the Department's position that if a covered entity using contract pharmacy services requests to purchase a covered drug from a participating manufacturer, the statute directs the manufacturer to sell the drug at the discounted price. If the entity directs the drug shipment to its contract pharmacy, we see no basis on which to conclude that section 340B precludes this type of transaction or otherwise exempts the manufacturer from statutory compliance. However, the entity must comply, under any distribution mechanism, with the statutory prohibition on drug diversion.

---

[6] *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023); *see also PhRMA v. McClain*, 95 F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768, 220 (2024).

9

*Id.* at 43,549-50.

Specifically, regarding the distinction between the mandates of the federal 340B statute and the appropriate regulation of contracts, pharmacies, and the law of agency by states, HRSA provided this comment and response:

> *Comment*: As a matter of State law, entities possess the right to hire retail pharmacies to act as their agents in providing pharmaceutical care to their patients. As a general rule, a person or entity privileged to perform an act may appoint an agent to perform the act unless contrary to public policy or an agreement requiring personal performance. Restatement of Agency 2d § 17 (1995). Hence, even in the absence of Federal guidelines, covered entities have the right to contract with retail pharmacies for the purpose of dispensing 340B drugs. By issuing guidelines in this area, [HRSA] is not seeking to create a new right but rather is *simply recognizing an existing right that covered entities enjoy under State law.*
>     *Response*: We agree. However, entities, under any distribution system, must comply with the statutory prohibition against diversion of 340B drugs to individuals who are not patients of the covered entities. Further, the dispensing of drugs, purchased with a 340B discount, must not result in the generation of a Medicaid rebate.

*Id.* (second emphasis added). Further responding to a comment that contract pharmacy could run afoul of state laws, HRSA was clear that contract pharmacy operated not under the federal 340B statute's requirements, but rather under the principles of state agency law: "The contract pharmacy would act as an agent of the covered entity, in that it would not resell a prescription drug but rather distribute the drug on behalf of the covered entity." *Id.* Indeed—HRSA disclaimed either the mandate or the ability to regulate under the 340B statute all the requirements for contract pharmacy arrangements that were subject to state law:

> As a general matter, we found it impossible to discuss each State's laws and regulations regarding drug purchase, distribution, and dispensing in relation to the many different types of entities and their individual needs. We believe it appropriate that … each entity and contractor [] be responsible for ensuring that their particular contracting arrangements and operations conform to the requirements of all applicable [state] laws and regulations.

10

*Id.* at 43,551; *see also id.* at 43,554 ("We believe that the relationship between the covered entity and the contract pharmacy is one of agency. However, the form of the relationship will be dictated by the terms of the contract; therefore, it is not essential to characterize the relationship as meeting or not meeting the standards which would serve under applicable law to establish an agency relationship.").

Then, as now, manufacturers "expressed concerns regarding the *potential* for drug diversion," but

> the Department has received no evidence of diversion that has required an official Departmental investigation. This includes the various drug distribution systems, among them those using contract pharmacy services. However, in response to manufacturers' concerns, the Department intends to study the use of contracted pharmacy services for accessing 340B drugs to determine if there is evidence of drug diversion. In particular, the Department will examine closely documented complaints, *including the results of manufacturers' audits*, will use other analyses as deemed appropriate, and will consider whether additional safeguards are necessary.

*Id.* at 43,550 (emphasis added). HRSA noted that the contract pharmacy agreements its guidance endorsed included provisions that would subject the contract pharmacy to audits by both manufacturers and HHS. *Id.* at 43,552.

HRSA rejected a comment that a manufacturer "has no recourse" should abuse occur in contract pharmacy:

> The manufacturer has sufficient remedies available to detect and eliminate abuse of the program. First, the manufacturer may audit the entity…. Second, the Department has developed a dispute resolution process to provide parties with [a] mechanism to bring before the Department allegations of behavior that is in violation of 340B. Third, the contract pharmacy guidelines provide that if the covered entity or its contractor is found to have violated the 340B prohibition against drug diversion (and duplicate discounting), the covered entity could be removed from the list of covered entities and could no longer access 340B pricing.

11

*Id.* at 43,553.[7]

In 2010, HRSA reiterated its position that state agency law, and not the 340B statute or its informal guidance, governed the scope of a covered entity's ability to contract with agents to receive delivery of and dispense prescription drugs on the covered entity's behalf. 75 Fed. Reg. 10,272 (Mar. 5, 2010) (final notice). HRSA stressed that a covered entity's use of contract pharmacies "does not lessen a covered entity's duty to ensure that the 340B program is being administered in compliance with the statute and HRSA guidelines":

> The covered entity has, and continues to bear, full responsibility and accountability for compliance with all requirements to prevent diversion of covered drugs to individuals other than patients of the covered entity, and to prevent situations in which a drug is subject to both the 340B discount and a Medicaid Rebate claim.

*Id.* at 10,273. With that reminder, however, HRSA endorsed covered entities' use of multiple pharmacy arrangements compliant with the 340B statute's requirements and HRSA guidance. *Id.* Once again, HRSA reaffirmed that manufacturers could audit covered entities with respect to their use of contract pharmacies consistent with the statutory requirements and reaffirmed the availability of the dispute resolution process. *Id.* at 10,274.

Accordingly, essentially from the outset of the 340B statute—in guidance nearly 30 years ago and reiterated both in further guidance a decade and a half later and in court filings in the past two years—HRSA made clear to manufacturers, covered entities, and others not only that the 340B statute did not regulate the delivery of drugs, but that effectuating the purpose of the statute both contemplated and required covered entity utilization of state law contractual and

---

[7] HRSA had separately provided notice and comment regarding the 340B statute's requirements for manufacturer audits. *See* 61 Fed. Reg. 65,406 (Dec. 12, 1996) (final notice). As discussed further below, in the subsequent three decades, manufacturers seldom sought permission to conduct such audits, and at least until 2024, HRSA appeared not to have denied such requests. *See infra; see also* 89 Fed. Reg. 28,643 at 28,644 (Apr. 19, 2024).

agency relationships. Indeed, while the factual context HRSA described in its notices is informative, the parties first to seek and obtain court rulings affirming the purposeful gap in the 340B statute's scope to permit the continued operation of state law to control prescription drug delivery and dispensing, nearly 25 years after HRSA's 1996 guidance, were manufacturers including Plaintiffs. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. United States Dep't of Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023); *see also PhRMA v. McClain*, 95 F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768, 220 (2024).

### B. Contract Pharmacy Arrangements Enable Utah's FQHCs to Deliver Healthcare Services to Vulnerable Utahns

As HRSA's 1996 guidance reflected, the state law agency and contract relationships between 340B covered entities and pharmacies relationships that the 340B statute both presumed and preserved serve vital roles for FQHCs like AUCH's members and other covered entities. Indeed, one of the key reasons that Utah's FQHCs can provide healthcare services across vast rural and frontier communities is by contracting with outside pharmacies to provide medication in these regions.[8] Some of AUCH's member FQHCs have contracted with outside pharmacies to provide access to medications for two reasons: 1) the FQHC does not have the finances to open its own pharmacy; or 2) the FQHC has one or more in-house pharmacies but needs to contract with outside pharmacies to provide access to patients who live far away from the in-house pharmacies. Pruhs Decl. ¶ 9. An AUCH member FQHC that has an in-house pharmacy might also be a great distance from the clinics that serve patients. For example, Mountainlands Family Health Center, one of AUCH's member FQHCs, had an in-house pharmacy in Provo, but had two small clinics located in Vernal. *Id.* The distance between Provo and Vernal is 153 miles and

---

[8] As discussed above, by statute, FQHCs must provide pharmacy and other services to their patients on a specified sliding-fee scale. *See* 42 U.S.C. § 254b.

13

the road is challenging or impassable during the winter months. *Id.* Meaning, patients could go to a clinic in Vernal but had no reasonable access to a nearby pharmacy to obtain any medications prescribed in those clinics. Mountainlands was eventually able to build an in-house pharmacy in Vernal, but in the interim, the FQHC contracted with a local pharmacy in Vernal to provide reasonable access to medications for patients in or near Vernal. *Id.* The ability to contract with the pharmacy in Vernal was vital to support the continuity of care for patients in these communities.

Notably, there are important safeguards in place to hold contract pharmacies to the same high standards that are required of AUCH's member FQHCs. As reflected in the discussion above of HRSA's guidance, Utah's FQHCs, like other covered entities, enter contract pharmacy arrangements that hold the covered entity accountable and require contract pharmacies to comply with 340B requirements. Pruhs Decl. ¶ 10. Importantly, these safeguards include compliance audits and procedures to prevent duplicate discounts and diversion. *Id.* Moreover, as described above, drug manufacturers can and do seek covered entities claims data, including claims from those covered entities' contract pharmacies; may seek to audit the covered entities for compliance with the 340B statute's prohibitions against duplicate discounts and diversion, including through the covered entities' use of contract pharmacies; and, following an audit and a failure to resolve the dispute through good faith efforts, may pursue relief through the binding 340B Administrative Dispute Resolution process.

In short, the contract pharmacy arrangements governed by Utah state law that AUCH's member FQHCs utilize serve a vital role in enabling them to fulfill their safety net public health mission and obligations.

14

### III.    Congress Established 340B Administrative Dispute Resolution as the Process to Address the Concerns Manufacturers Raise in This Litigation

Ironically, while Plaintiffs in these related cases allege Utah SB 69 impinges upon what Plaintiffs mistakenly characterize as a comprehensive federal statutory scheme, Plaintiffs and other manufacturers necessitated Utah to enact SB 69 because they disregarded the statutory 340B Administrative Dispute Resolution process that Congress enacted as the remedy for their purported concerns regarding duplicate discounts and diversion. In 2010, Congress revisited and expanded the 340B statute and directed that HRSA implement a binding 340B administrative dispute resolution process to address disputes regarding allegations by covered entities of manufacturer overcharges on the one hand, and allegations by manufacturers of duplicate discounts or diversion on the other:

> Section 7102 of the Patient Protection and Affordable Care Act (Pub. L. 111– 148), as amended by section 2302 of the Health Care and Education Reconciliation Act (Pub. L. 111–152) … requires the Secretary to promulgate regulations establishing and implementing a binding 340B ADR process for certain disputes arising under the 340B Program. Under the 340B statute, the purpose of the 340B ADR process is to resolve (1) claims by covered entities that they have been overcharged for covered outpatient drugs by manufacturers and (2) claims by manufacturers, after a manufacturer has conducted an audit as authorized by section 340B(a)(5)(C) of the PHS Act, that a covered entity has violated the prohibition on diversion or duplicate discounts.

89 Fed. Reg. 28,643 at 28,643 (Apr. 19, 2024) (final rule).

Notwithstanding any conclusory allegations to the contrary, the factual record in HRSA's 2024 340B ADR rulemaking presented no history of difficulty by manufacturers in obtaining the information necessary to request permission for and conduct a manufacturer audit that Congress made prerequisite to a manufacturer initiating the 340B ADR process regarding potential duplicate discounts or diversion by a covered entity. To the contrary, as HRSA noted in its 2024 340B ADR final rule, in the previous three decades of the 340B statute's existence, HRSA had

15

seldom needed to address disputes by manufacturers or covered entities: other than "an issue involving some manufacturers placing restrictions on certain covered entities' use of contract pharmacies," just three covered entity-initiated disputes since 2019, and just four dispute requests of any kind in the three decades prior to that. 89 Fed. Reg. at 28,644. HRSA took note both of its own audit and compliance activities, but also the historically sparse number of manufacturer requests—just two in two years—for the manufacturer audit required by the statute before a manufacturer could initiate the 340B ADR process. *Id.*

Specifically, HRSA's fact finding belied the notion that manufacturers were or are routinely unable to obtain agency permission to conduct audits required by the statute:

> The requirement for a manufacturer to conduct an audit prior to initiating the 340B ADR process is a statutory requirement…. Multiple manufacturers have utilized the 1996 manufacturer audit guidelines to conduct audits of covered entities. *In the last 5 years, six have followed the guidelines to request audits of covered entities. During that same time frame, HRSA has not denied a request for a manufacturer audit of a covered entity,* thereby, demonstrating the guidelines are not overly burdensome or present any barriers to a manufacturer's ability to perform an audit of a covered entity. Further, the guidelines present a clear and transparent process that may decrease burden on both parties with open dialogue and present an objective review of a covered entity's compliance.

89 Fed. Reg. at 28,644 (emphasis added) (citations omitted). And as discussed more fully below, soon after Congress mandated that HRSA implement a binding 340B ADR, the Supreme Court held that 340B ADR provided the avenue to address and remedy the disputes assigned to that process by statute, such that the parties seeking relief for those disputes were foreclosed from other avenues. *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011).

The Court may note from the foregoing, notwithstanding the Congressional mandate that HRSA implement binding 340B ADR by September 2010 and the Supreme Court's holding in *Astra* in 2011, that HRSA did not implement a final rule for the binding 340B ADR process until

16

June 2024, nearly fourteen years after the Congressional mandate. That is correct. HRSA's implementation of the binding 340B ADR came after covered entity lawsuits in 2020 to require agency action and an initial implementation attempt withdrawn in 2022 following manufacturer challenges. To be sure, there was no legal effort by manufacturers during that time to require HRSA to implement the long-overdue 340B ADR process, even as its absence effectively foreclosed the possibility of covered entities seeking relief from manufacturer overcharges.[9] But as the following sections describe, manufacturers decided that sauce for covered entity geese was not sauce for their ganders; and rather than pursue the 340B ADR remedy that Congress specified to address manufacturer disputes regarding duplicate discounts or diversion, manufacturers instead resorted to self-help unilateral restrictions on delivery that led directly to Utah enacting SB 69 in response.

IV.   **Utah SB 69 Originates from Manufacturers Choosing to Disregard the Statutory 340B ADR Remedy and Instead Resort to Harmful Self-Help, Unilateral Restrictions on State Law-Governed Contract Pharmacy Relationships**

As discussed in the parties' briefs, beginning in 2020, drug manufacturers began imposing unilateral restrictions on the ability of covered entities including AUCH's member FQHCs to contract with outside pharmacies for the delivery and dispensing of drugs to the covered entities' patients. *See also* Pruhs Decl. ¶ 12. The unilateral restrictions imposed by drug manufacturers did not merely pose a risk to the communities served by those contract pharmacies—they caused tangible, material harm to the public health of Utahns that necessitated Utah SB 69.

---

[9] Indeed, manufacturers including some of Plaintiffs were more than content to seek to enforce *Astra*'s ruling to their benefit. *See, e.g.*, *United States ex rel. Adventist Health Sys. /W. v. AbbVie, Inc.*, 723 F. Supp. 3d 882, 887 (C.D. Cal. 2024).

As a result of drug manufacturers' unilateral restrictions on the use of contract pharmacies under 340B, AUCH's member FQHC providers had to try to find other similar products that are not under a contract pharmacy restriction or spend time arranging for patients to be placed on payment assistance programs. Pruhs Decl. ¶ 13. These otherwise unnecessary administrative tasks took providers away from time that should be spent on direct patient care. *Id.* For some of AUCH's member FQHCs, the only option available was to require patients to travel inconvenient distances to an in-house pharmacy to receive access to medications that the FQHCs provide on a sliding-fee scale per their statutory mandate. *Id.* Devastatingly, the onset of the many contract pharmacy restrictions overlapped with the COVID-19 pandemic, when AUCH's member FQHCs were already experiencing staff shortages. *Id.* These shortages compounded the harm to the services and operations Utah's FQHCs experienced during the pandemic due to the drug manufacturers' unilateral restrictions. *Id.* While AUCH is not privy to the financial reports of its member FQHCs beyond what they disclose voluntarily, AUCH has been informed that many FQHCs experienced financial losses due to the manufacturer restrictions. *Id.* at ¶ 15. Because Utah's FQHCs serve some of the most vulnerable communities and operate on thin financial margins, the revenue FQHCs earn under 340B is imperative for maintaining operations. *Id.* at ¶ 12.

As also discussed above and in the parties' briefs, beginning in 2021, manufacturers filed lawsuits challenging HRSA's ability to bring enforcement action regarding the manufacturers' unilateral restrictions. In 2023 and 2024, respectively, the Third and D.C. Circuit Courts of Appeal ruled that the 340B statute did not address, and therefore did not alter, state law governing the delivery of drugs as part of a bona fide "offer" to sell. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. United States Dep't of*

18

*Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023). In response, state legislatures beginning with Arkansas began enacting state law provisions making explicit that the law of their respective states did not permit manufacturers to restrict the rights of a covered entity to contract with pharmacies for the delivery and dispensing of prescription drugs to the covered entity's patients on behalf of the covered entity. Apart from one district court ruling in West Virginia, federal courts have consistently rejected manufacturer challenges to those laws along the lines of those Plaintiffs advance in these related cases.[10]

Utah's SB 69 is one of many such state laws. The protections offered by SB69 would prevent ongoing harm to Utah's public health safety net owing to the manufacturers' restrictions. In the absence of Utah SB 69, the factual record reflects that Utah FQHCs would face severe operational setbacks, and the state's most vulnerable communities will lose access to lifesaving services.

## ARGUMENT

Plaintiffs' allegations regarding Utah SB 69 are not only mistaken as a matter of law; they ignore that the protections Utah SB 69 implemented for Utah's safety net, including AUCH's member FQHCs, came about precisely because Plaintiffs and other manufacturers disregarded the 340B ADR enforcement mechanism Congress created to address their purported concerns and resorted instead to self-help. Far from undermining federal law, SB 69 helps to

---

[10] *Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95 F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768, 220 (2024); *PhRMA v. Murrill*, No. 6:23-CV-00997, 2024 WL 4361597 (W.D. La. Sept. 30, 2024); *Novartis Pharms. v. Bailey*, No. 2:24-cv-04131-MDH, 2025 WL 489881 (W.D. Mo. Feb. 13, 2025); *Novartis Pharms. v. Fitch*, 738 F. Supp. 3d 737, 744 (S.D. Miss. 2024); *PhRMA v. Fitch*, No. 1:24-CV-160-HSO-BWR, 2024 WL 3277365 (S.D. Miss. July 1, 2024); *AbbVie Inc. v. Fitch*, No. 1:24-CV-184-HSO-BWR, 2024 WL 3503965 (S.D. Miss. July 22, 2024); *AstraZeneca v. Fitch*, No. 1:24CV196-LG-BWR, 2024 WL 5345507 (S.D. Miss. Dec. 23, 2024); Order Den. Pl.'s Mots. Prelim. Inj., *Novartis Pharms.*, No. 1:24-cv-01557 (D. Md. Sept. 5, 2024), ECF No. 57; *but see PhRMA v. Morrisey*, 760 F. Supp. 3d 439 (S.D.W. Va. 2024).

effectuate the purpose of, was anticipated by, and complements the 340B statute by preserving access to essential drugs for vulnerable populations that Plaintiffs themselves improperly and unilaterally restricted.

> **A.    Plaintiffs necessitated Utah SB 69 by disregarding the 340B ADR process Congress specified to address their purported concerns regarding duplicate discounts and diversion**

As discussed above, Congress included a binding administrative dispute resolution process in the 340B statute as the mechanism by which, after a manufacturer has conducted an audit as authorized by section 340B(a)(5)(C), a manufacturer may seek relief for claims that a covered entity has violated the prohibition on diversion or duplicate discounts. 42 U.S.C. § 256b(d)(3); 42 C.F.R. § 10.20. Those concerns formed the basis of the restrictions Plaintiffs seek to maintain; and yet are precisely the concerns Congress intended to be resolved in the 340B ADR process and not through unilateral restrictions and resultant litigation such as these.

In *Astra USA, Inc. v. Santa Clara Cty.*, 563 U.S. 110, 121-22 (2011), the Supreme Court held that Congress intended to foreclose other avenues of relief for the categories of claims that Congress assigned to 340B ADR—notwithstanding that HRSA had not implemented the 340B ADR process at the time, and would not implement the final version for over a decade. Yet Plaintiffs and other manufacturers disregarded the 340B statutory language as reflected in both the Pharmaceutical Pricing Agreement and the Supreme Court's ruling in *Astra* by resorting to the self-help unilateral restrictions that necessitated Utah SB 69. Simply put, the Court cannot give credence to Plaintiffs' claims of an implicit but comprehensive statutory scheme under the 340B statute that would foreclose Utah SB 69, given that Plaintiffs' own disregard of the statute's explicit provisions necessitated Utah's law. To do otherwise would read out of existence

20

the very provisions of the 340B statute to which Plaintiffs voluntarily agreed in their

Pharmaceutical Pricing Agreements with the U.S. Secretary of Health and Human Services.

> **B.  Unlike the explicit 340B ADR remedy Congress specified, Congress purposefully left delivery and dispensing of prescription drugs unaltered in the 340B statute**

As discussed above, and in contrast to the explicit and comprehensive 340B ADR remedy

Congress specified for the concerns regarding duplicate discounts and diversion that Plaintiffs

claim to harbor, multiple Circuit Courts have affirmed the same observations that HRSA made

nearly 30 years ago: namely, that the 340B statute purposefully left undisturbed pre-existing state

law regarding the delivery and dispensing of prescription drugs, including appropriate

contractual pharmacy relationships. *See Pharm. Rsch. & Manufacturers of Am. v. McClain*, 95

F.4th 1136 (8th Cir.), *cert. denied*, 145 U.S. 768, 220 (2024); *Novartis Pharms. Corp. v.

Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. United States Dep't of

Health & Hum. Servs.*, 58 F.4th 696 (3d Cir. 2023).

This reading of the 340B statute makes the most sense for the reasons HRSA outlined in

its 1996 notice. Congress neither created nor authorized in the 340B statute a comprehensive

regulatory scheme to displace the various pre-existing state controls for the delivery and

dispensing of prescription drugs, for example, through state boards of pharmacy; nor did the

340B statute address itself to any of the entities involved in the distribution and delivery of

prescription drugs, including wholesalers and other distributors. As HRSA observed, it would

not make sense to do so, because the myriad pre-existing relationships and obligations of

covered entities and outside pharmacies—including, like those of AUCH's member FQHCs that

operate under separate statutory obligations to provide pharmacy services—were beyond the

340B statute's purpose of creating the voluntary pricing agreement manufacturers could enter as

21

a condition for participating in Medicaid. As the parties' briefs otherwise address, the 340B statute's relatively sparse requirements, and frequently-noted lack of a grant of regulatory authority, militates in favor of the permissive reading of the 340B statute for which HRSA first provided context nearly 30 years ago, and that Utah has followed in enacting Utah SB 69.

> **C.      Utah SB 69 is an appropriate and necessary response to Plaintiffs' and other manufacturers' unilateral resort to self-help and the imposition of restrictions on the rights of Utah's safety providers, including AUCH's member FQHCs, to contract with pharmacy agents for the delivery and dispensing of prescription drugs to Utah's most vulnerable patient populations**

Utah's SB 69 legislation was not only entirely appropriate under the 340B statutory framework, but it was also a necessary measure in order to protect the state's safety net providers, including AUCH's member FQHCs, who serve Utah's most vulnerable patient populations. As reflected in the legislative fact-finding that led to Congress's enactment of the 340B statute, when left unconstrained, manufacturers seek (as would any for-profit entity) to maximize revenue through advantageous pricing strategies. But those strategies lead to profoundly negative effects on the ability of safety net providers like AUCH's member FQHCs to serve vulnerable Utahns that Congress intended to protect through Sections 330 and 340B of the Public Health Service Act. Utah SB 69 operates in harmony with Congress's intent in creating the 340B statute—to "stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. 102-384(II) at 12 (1992).

## CONCLUSION

For the foregoing reasons, amicus Association for Utah Community Health respectfully urges this Court to grant Defendants' motions to dismiss Plaintiffs' claims.

22

Dated: May ___, 2025                    Respectfully submitted,

                                        FELDESMAN LEIFER LLP

                                        */s/ Stephen M. Kuperberg*
                                        Stephen M. Kuperberg (admitted *pro hac vice*)
                                        Madelaine M. Cleghorn (admitted *pro hac vice*)
                                        *Counsel for Amicus Curiae Association for Utah Community Health*

                                        MITCHELL BARLOW & MANSFIELD, P.C.

                                        */s/ J. Ryan Mitchell*
                                        J. Ryan Mitchell
                                        Christopher A. Langston
                                        Colby Tinney
                                        *Local Counsel for Amicus Curiae Association for Utah Community Health*

23

## CERTIFICATE OF SERVICE

I hereby certify that on this __ day of May, 2025, I caused a true and correct copy of the foregoing **BRIEF OF *AMICUS CURIAE* ASSOCIATION FOR UTAH COMMUNITY HEALTH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** to be filed via the Court's electronic filing system, which automatically provides notice of the filing to all counsel of record.

*/s/ Colby Tinney*

24